# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| I.G.I., a minor, by and through his next friend and father, M.G.L., <br><br> *Plaintiff*, <br><br> v. <br><br> KRISTI NOEM, in her official capacity as Secretary of Homeland Security; ROBERT F. KENNEDY JR., in his official capacity as Secretary of Health and Human Services; JOSEPH B. EDLOW, in his official capacity as Director of U.S. Citizenship and Immigration Services (USCIS); TODD LYONS, in his official capacity as Acting Director, U.S. Immigration and Customs Enforcement (ICE); KENNETH GENALO, in his official capacity as Acting Executive Associate Director, ICE Enforcement and Removal Operations; and SCOTT LADWIG, in his official capacity as Acting Director, ICE New Orleans Field Office, <br><br> *Defendants*. | Case No. 1:25-cv-3898 |

## COMPLAINT FOR INJUNCTIVE RELIEF AND DECLARATORY JUDGMENT

**INTRODUCTION**

1.        In the early hours of May 21, 2025, Plaintiff I.G.I. ("Elias")[1], a sixteen-year-old boy, was unlawfully removed[2] from the United States to Guatemala, after being suddenly arrested, detained in a hotel room in Alexandria, Louisiana for approximately 12 hours, and prohibited from contacting his lawyers or anyone else. This removal was lawless: Defendants had no removal order for Elias, nor did they even attempt to obtain one. Congress has provided a clear and mandatory process to remove noncitizens like Elias, and this requires a final removal order, issued only after providing notice, access to counsel, and a meaningful opportunity to contest removability and seek relief from removal. Despite this clear direction from Congress, and in blatant violation of Elias's constitutional rights, Defendants summarily removed him with no process whatsoever.

2.        Defendants carried out this unlawful removal with full knowledge that they had not sought or obtained a removal order, as required by statute. They carried it out despite the fact that Elias originally came to the United States as an unaccompanied child and has Special Immigrant Juvenile Status ("SIJS"), which means the government had determined that it was not in his best interest to return to Guatemala and had placed him on a path to permanent status. And they carried out the illegal removal despite strenuous objections from Elias and his father, M.G.L. ("Marcos"), as well as repeated requests from them and their counsel for communication. Defendants' forcible removal of Elias to Guatemala without notice, process, or access to counsel—executed in knowing defiance of statutory

---

[1] To protect the security and safety of the Plaintiff, he and his father and next friend have been assigned pseudonyms and are referred to as such throughout the Complaint. A Motion for Leave to Proceed Under Pseudonym is being filed concurrently with this Complaint.

[2] Elias was arrested by Defendants, held in custody in a hotel with constant supervision by Defendants' agents, and then forcibly put on a plane that was carrying out deportations of noncitizens from Alexandria, Louisiana to Guatemala. Plaintiff will describe these acts as a deportation throughout, though they were not authorized by any removal order.

and constitutional protections—demands immediate judicial intervention to facilitate Elias's return to the United States.

## JURISDICTION AND VENUE

3.     This Court has jurisdiction to hear this case under 28 U.S.C. § 2201, the Declaratory Judgment Act, and 28 U.S.C. § 1331, Federal Question Jurisdiction, and because the individual Defendants are U.S. officials, 28 U.S.C. § 1346(a)(2).

4.     The Court has authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure, 28 U.S.C. §§ 2201-2202, the All Writs Act, and the Court's inherent equitable powers.

5.     Venue is proper in this District because Defendants Kristi Noem, Robert F. Kennedy, Jr., Joseph Edlow, Todd Lyons, and Kenneth Genalo reside in the District of Columbia. 28 U.S.C. § 1391(e)(1) (venue is proper in any district where "a defendant in the action resides"); *Nestor v. Hershey*, 425 F.2d 504, 521 n.22 (D.C. Cir. 1969) ("Where a public official is a party to an action in his official capacity he resides in the judicial district where . . . he performs his official duties.").

## THE PARTIES

6.     Plaintiff Elias is a sixteen-year-old boy who previously resided in New Orleans, Louisiana, until his unlawful removal from the United States to Guatemala on May 21, 2025. He brings this action by and through his father and next friend, Marcos. His current address is c/o Tulane Immigrant Rights Clinic, 6329 Freret Street, Suite 130, New Orleans, LA 70118.[3]

---

[3] As set forth in Plaintiff's Motion to Proceed Under Pseudonym, Plaintiff respectfully asks the Court to allow him to use the address of his attorney in this publicly filed Complaint in order to ensure anonymity, but is willing to share his full name and address with Defendants and the Court under seal.

7.     Defendant Kristi Noem is the Secretary of the Department of Homeland Security ("DHS"). She is the cabinet-level secretary responsible for all immigration enforcement in the United States. She is sued in her official capacity.

8.     Defendant Robert F. Kennedy Jr. is the Secretary of the Department of Health and Human Services ("HHS"). He is the cabinet-level secretary responsible for the oversight of "unaccompanied alien children" through the Office of Refugee Resettlement ("ORR"). He is sued in his official capacity.

9.     Defendant Joseph B. Edlow is the Director of U.S. Citizenship and Immigration Services ("USCIS"), a subcomponent of DHS. He is the head of the federal agency responsible for administering all benefits associated with SIJS. He is sued in his official capacity.

10.     Defendant Todd Lyons is the Acting Director of U.S. Immigration and Customs Enforcement ("ICE"), also a subcomponent of DHS. He is the head of the federal agency responsible for all immigration enforcement in the United States. He is sued in his official capacity.

11.     Defendant Kenneth Genalo is the Acting Executive Associate Director of ICE Enforcement and Removal Operations. He is the head of the ICE office that carries out arrests of noncitizens and removals from the United States. He is sued in his official capacity.

12.     Defendant Scott Ladwig is the ICE New Orleans Acting Field Office Director. He is the head of and oversees the ICE office that unlawfully deported Plaintiff Elias. He is sued in his official capacity.

## LEGAL BACKGROUND

### *Legal Authority to Remove Noncitizens*

13.     Congress set forth procedures for the removal of noncitizens in the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq*. The INA provides the U.S. government authority to deport noncitizens who are properly and lawfully ordered removed. 8 U.S.C. § 1231.

14.     The primary procedure through which the government can obtain a final order of removal against a noncitizen is via removal proceedings under Section 240 of the INA. *See* 8 U.S.C. § 1229a ("Section 240 Proceedings"). Per the INA, an immigration judge "shall conduct proceedings for deciding inadmissibility or deportability" of noncitizens under this section. 8 U.S.C. § 1229a(1). These proceedings "shall be the sole and exclusive procedure for determining whether an alien may be admitted to the United States, or, if the alien has been so admitted, removed from the United States," apart from certain statutory exceptions. 8 U.S.C. § 1229a(3). To initiate Section 240 Proceedings, DHS must issue and file a charging document, known as a Notice to Appear, with an immigration court. 8 C.F.R. § 1239.1. No jurisdiction vests with the immigration court unless and until a Notice to Appear is filed. 8 C.F.R. § 1003.14.

15.     Individuals in Section 240 Proceedings retain the right to contest their removability, as well as their right to seek relief from removal. 8 U.S.C. § 1229a. They also have the opportunity to investigate and prepare their cases, to retain and rely on the assistance of counsel, to present evidence before the immigration judge, and to confront the evidence against them. 8 U.S.C. § 1229a(b)(4). Following the immigration judge's decision, they have the right to bring an appeal before an administrative board and subsequently seek review by a federal circuit court. *See* 8 U.S.C. §§ 1229a(c)(5); 1252(b).

16.     In certain circumstances, the government can remove noncitizens without initiating Section 240 Proceedings. *See, e.g.*, 8 U.S.C. § 1225(b) (allowing for expedited removal of certain inadmissible noncitizens); 50 U.S.C. § 21 (commonly referred to as the Alien Enemies Act, allowing for removal of certain noncitizens when the United States is suffering war, invasion, or incursion and other conditions are met). In other circumstances, certain noncitizens in Section 240 Proceedings can choose to depart the United States voluntarily, at their own expense. 8 U.S.C. § 1229c. Notwithstanding these narrow exceptions—none of which apply in the instant case—Section 240

Proceedings remain the principal avenue through which the government may remove a noncitizen, and removal under the INA is only permitted upon issuance of a final removal order, *see* 8 U.S.C. § 1231.

"*Unaccompanied Alien Children*"

17.    Congress has recognized that noncitizen youth who come to the United States without a parent are especially vulnerable and must receive additional protections. Therefore, through the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), Congress set forth special protections for "unaccompanied alien children" ("UACs"). *See* 154 Cong. Rec. H10905 (daily ed. Dec. 10, 2008); 154 Cong. Rec. S10887 (daily ed. Dec. 10, 2008); 8 U.S.C. § 1232. A UAC is defined as a child who (A) lacks lawful immigration status in the United States; (B) is under the age of 18; and (C) has no parent or legal guardian in the United States, or no such parent or legal guardian is available to provide care and physical custody. 6 U.S.C. § 279(g)(2).

18.    Through the TVPRA, Congress amended the INA to provide that UACs from non-contiguous countries,[4] such as Guatemala, must be placed in Section 240 Proceedings. 8 U.S.C. § 1232(a)(5)(D)(i). Therefore, 8 U.S.C. § 1229a exclusively governs removal proceedings of noncitizens designated UACs and is the only process for determining whether they can stay in the United States or can be removed. 8 U.S.C. § 1229a(3).

19.    The TVPRA also requires that HHS, through ORR, manage the care and custody of UACs, 8 U.S.C. § 1232(c)(2), and that it ensure, "to the greatest extent practicable," that UACs who are in custody or were previously in custody "have counsel to represent them in legal proceedings or matters and protect them from mistreatment, exploitation, and trafficking," 8 U.S.C. § 1232(c)(5). *See*

---

[4] UACs from contiguous countries are subject to different procedures than those from non-contiguous countries. *See* 8 U.S.C. § 1232(a)(2). Contiguous countries are those that share a land border with the United States—i.e., Mexico and Canada. All other countries are "noncontiguous" countries.

*also* 8 U.S.C. § 1232(a)(5)(D)(iii). Once a child has been designated a UAC, these statutory protections attach to the child and remain in place as their immigration case progresses.

### *Special Immigrant Juvenile Status*

20.     Separate and apart from UACs, in 1990, Congress created SIJS to protect another category of vulnerable immigrant children and provide them a pathway to citizenship. Immigration Act of 1990, Pub. L. No. 101-649, § 153, 104 Stat. 4978 (1990) (amending various sections of the INA); Special Immigrant Status, 58 Fed. Reg. 42843, 43844 (Aug. 12, 1993) ("This rule alleviates hardships experienced by some dependents of United States juvenile courts by providing qualified [noncitizens] with the opportunity to apply for special immigrant classification and lawful permanent resident status, with [the] possibility of becoming citizens of the United States in the future."). Since 1990, Congress has amended the INA multiple times to expand the protections of SIJS, most recently in 2008, through the TVPRA, Pub. L. 110-457, § 235(d), 122 Stat. 5044 (2008).

21.     Currently, the INA provides that those eligible for SIJS designation, as relevant here, are noncitizen youth who are present in the United States; who have been declared dependent on a state juvenile court; who cannot be reunified with one or more parents because of abuse, neglect, or abandonment; and for whom it has been determined that it is not in their best interest to return to their country of origin. 8 U.S.C. § 1101(a)(27)(J); 8 C.F.R. § 204.11(c).

22.     Youth can apply for SIJS from USCIS upon receipt of a state court order finding they cannot be safely reunited with parent(s) nor safely sent back to their country of origin. The application process includes submitting a Form I-360 SIJS Petition to USCIS, along with the predicate state court order and other supporting evidence. *See* 8 C.F.R. § 204.11(b). USCIS then considers the application and supporting documentation to determine whether to exercise its statutory "consent function" to approve the petition. *See* 8 U.S.C. § 1101(a)(27)(J)(iii). By exercising its statutory consent function to

grant SIJS, the agency recognizes the state court's determinations, including that the child's return to their country of origin would be contrary to their best interests. 8 U.S.C. § 1101(a)(27)(J)(iii).

23.    The main benefit of SIJS—and indeed, its core purpose—is that it confers on vulnerable young people the right to seek lawful permanent resident ("LPR") status, commonly referred to as a green card, while remaining in the United States, through a process called adjustment of status. *See* 8 U.S.C. § 1255(h); *see also Garcia v. Holder*, 659 F.3d 1261, 1271 (9th Cir. 2011) (confirming that the design of the SIJS program, then, "show[s] a congressional intent to assist a limited group of abused children to remain safely in the country with a means to apply for LPR status").

24.    SIJS classification also conveys a host of other important benefits. SIJS beneficiaries are "deemed . . . to have been paroled into the United States" for the purposes of adjustment of status. 8 U.S.C. § 1255(h)(1). Further, Congress exempted SIJS youth from many common inadmissibility grounds and created a generous waiver of many of the non-exempted inadmissibility grounds. 8 U.S.C. § 1255(h)(2). Congress also explicitly provided that certain grounds for removal, "shall not apply to a special immigrant described in section 1101(a)(27)(J) of this title [the SIJS statute] based upon circumstances that existed before the date the [noncitizen] was provided such special immigrant status." 8 U.S.C. § 1227(c).

25.    Although SIJS renders youth eligible to apply for LPR status, they can only do so when a visa is immediately available to them. 8 U.S.C. § 1255(h). USCIS has also taken the position that SIJS beneficiaries must be physically present in the United States at the time of the filing and adjudication of any adjustment of status application.[5] However, there is an annual limit on visas

---

[5] 8 C.F.R. § 245.1(a); *see also* USCIS Pol'y Manual Vol. 7, Part. F, Ch. 7.C, *available at* https://www.uscis.gov/policy-manual/volume-7-part-f-chapter-7 (stating that SIJS beneficiaries must be "physically present in the United States at the time of filing and adjudication of an adjustment application"); *id.* Vol. 7, Part A, Ch. 1.B ("Adjustment of status to lawful permanent residence

available to SIJS beneficiaries. 8 U.S.C. § 1153(b)(4). And since 2016, the number of SIJS beneficiaries has surpassed the supply of available visas for most countries, leaving what has been estimated to be more than 100,000 young people in a backlog, often waiting for years to apply for a green card.[6]

26.    While in this backlog, SIJS youth were vulnerable to removal from the United States and were unable to work lawfully. In March 2022, to address the harmful consequences of the backlog, USCIS announced that all young people granted SIJS would also automatically be considered for a four-year discretionary grant of deferred action, meaning that they would be protected from removal while waiting for a visa to become available, and could also apply for work authorization.[7] In June 2025, USCIS rescinded this policy, although it indicated that SIJS youth who had already been granted deferred action would generally be able to retain this status until its expiration.[8]

27.    Importantly, once granted, SIJS cannot be revoked except with a series of procedural safeguards. 8 C.F.R. § 205.2. Specifically, the Secretary of DHS must find "good and sufficient cause" for revocation, the agency must provide notice of intent to revoke, and the youth must be given the opportunity to present evidence opposing revocation. 8 U.S.C. § 1155; 8 C.F.R. § 205.2; *see also* USCIS Policy Manual, Vol. 6, Part J, Ch. 4 (Oct. 20, 2025), *available at* https://www.uscis.gov/policy-

---

describes the process by which an alien obtains U.S. LPR status while physically present in the United States."), *available at* https://www.uscis.gov/policy-manual/volume-7-part-a-chapter-1; 22 C.F.R. § 42.11 (denoting SIJS as an "adjustment-only" category).

[6] *See* R. Davidson et al., *False Hopes: Over 100,000 Immigrant Youth Trapped in the SIJS Backlog* 22, THE END SIJS BACKLOG COAL. (Dec. 2023), *available at* https://bit.ly/42Ha2N8.

[7] USCIS, Policy Alert: Special Immigrant Juvenile Classification and Deferred Action (March 7, 2022) ("2022 Policy Alert"), *available at* https://www.uscis.gov/sites/default/files/document/policy-manual-updates/20220307-SIJAndDeferredAction.pdf.

[8] USCIS, Policy Alert: Special Immigrant Juvenile Classification and Deferred Action (June 6, 2025) ("2025 Policy Alert"), *available at* https://www.uscis.gov/sites/default/files/document/policy-manual-updates/20250606-SIJDeferredAction.pdf.

manual/volume-6-part-j-chapter-4 (stating that "USCIS issues a Notice of Intent to Revoke (NOIR) and provides the petitioner an opportunity to offer evidence in support of the petition and in opposition to the grounds alleged for revocation of the approved petition"). The youth also has the right to appeal any adverse ruling. 8 C.F.R. § 205.2.

28.     Taken together, the structure of the SIJS program—including the requirement that recipients remain in the United States to move forward in the process, the grant of parole for the purpose of adjustment, and the waiver of grounds of inadmissibility and removability—evinces Congressional intent that SIJS recipients remain safely in the United States until they can adjust to become LPRs.

### ICE Directive 11064.3: Interest of Noncitizen Parents and Legal Guardians of Minor Children or Incapacitated Adults

29.     ICE Directive 11064.3, *Interests of Noncitizen Parents and Legal Guardians of Minor Children or Incapacitated Adults*—which was promulgated on July 14, 2022, and remained in effect until July 1, 2025—governed, among other things, how ICE addresses the children of noncitizens.[9]

30.     As relevant here, the Directive requires the following:

- "The [ICE Enforcement and Removal Operations] Parental Interests Coordinator is responsible for . . . [p]roviding guidance to . . . personnel on: . . . (e) Ensuring that detained Covered Individuals are provided the opportunity to consult with counsel, consular officials, family courts and dependency courts, child welfare personnel, and family members or friends in order to arrange guardianship or care . . . ." Directive 11064.3, ¶ 4.3(3) (emphasis added).

- "Unless ICE is effectuating an enforcement action against the minor child(ren), ICE personnel should under no circumstances take custody of or transport the minor child(ren). ICE should

---

[9] On July 2, 2025, ICE issued ICE Directive 11064.4, Detention and Removal of Alien Parents and Legal Guardians of Minor Children, superseding ICE Directive 11064.3.

remain on the scene with the Covered Individual until the designated third party . . . assumes physical custody of the minor child(ren)." *Id.* ¶ 5.2(3) (footnote omitted) (emphasis added); *see also* Directive 11064.4, ¶ 5.2(3).

- "When a detained Covered Individual is subject to a final order of removal and ICE is effectuating their removal, [ICE Field Office Directors ("FODs")] or their appropriate designees shall facilitate the detained Covered Individual's efforts to make arrangements for their minor child(ren) . . . for whom they serve as legal guardian. These provisions may include the Covered Individual's attempt to arrange temporary guardianship for their minor child(ren) . . . for whom they serve as legal guardian if they will be remaining in the United States, or—where the Covered Individual requests reunification with their minor child(ren) . . . for whom they serve as legal guardian prior to removal—to obtain travel documents for the minor child(ren) . . . to accompany them to the Covered Individual's country of removal." Directive 11064.3 ¶ 5.7(1) (emphasis added); *see also* Directive 11064.4, ¶ 5.6(1).

- "[FODs] must afford such detained Covered Individuals a reasonable opportunity to make a decision regarding the care or travel of their minor child(ren) . . . for whom they serve as legal guardian, as well as to consult with counsel . . . ." Directive 11064.3 ¶ 5.7(2) (emphasis added); *see also* Directive 11064.4, ¶ 5.6(2).

- "In addition, the FOD may, subject to security considerations, provide sufficient notice of the removal itinerary to the detained Covered Individual or to their legal counsel or representative so that coordinated travel arrangements may be made for the Covered Individual's minor child(ren) . . . for whom they serve as legal guardian." Directive 11064.3 ¶ 5.7(3); *see also* Directive 11064.4 ¶ 5.6(3).

**FACTUAL BACKGROUND**

*Elias Came to the United States as a UAC and Was Later Granted SIJS*

31.    Elias was born in Guatemala in 2009 and entered the United States alone as a 14-year-old boy on or about December 7, 2023.

32.    Before coming to the United States, Elias's life was punctuated by trauma. He endured severe physical and emotional abuse and neglect at the hands of his mother. The physical abuse that he suffered was so severe that he was admitted to the hospital for his injuries. The neglect he faced was constant: Elias was often left alone for days or *even weeks* at a time without access to food. Although other family members tried to help as best as they could, Elias lived in fear of his mother and her partner, and his home became a place of anxiety and danger.

33.    At 14, Elias decided to flee to the United States, where he had other family, including his father. He arrived in the United States alone, on or about December 7, 2023, and DHS officials designated him a UAC. As required by the TVPRA, they then transferred him to the custody of ORR.

34.    On December 9, 2023, DHS issued Elias a Notice to Appear before an immigration court for Section 240 Proceedings, charging him as an "alien present in the United States without being admitted or paroled" under 8 U.S.C. § 1182(a)(6)(A)(i). The Notice to Appear did not list a date or time that Elias was required to appear. More importantly, it was never filed with any immigration court and therefore, DHS never actually initiated Section 240 Proceedings against Elias. *See* 8 C.F.R. § 1003.14 ("Jurisdiction vests, and proceedings before an Immigration Judge commence, when a charging document is filed with the Immigration Court by [DHS].").

35.    On December 29, 2023, ORR released Elias to his father, Marcos, in New Orleans, Louisiana, where he also had other family, including his older brother, aunts, and uncles. Shortly thereafter, he enrolled in school and began attending an immersive program designed to help students develop English language proficiency and increase their success at school. Elias thrived in his new

school, where he was part of a small group focused on improving phonics and reading fluidity. He also received academic and mental health support, which helped him to achieve steady progress towards fulfilling his graduation requirements. After completing this program, he began attending high school. He was "so excited to know" that he was making progress towards earning his diploma.

36.    To address the trauma of the abuse he suffered in Guatemala at the hands of his mother and her partner, Elias began working with a social worker. With the help of his social worker, as well as his family and friends, Elias began to feel focused, calm, and safe in his school environment—a stark contrast from his experiences in Guatemala. He also made considerable strides in his education as he began learning phonics and developing his reading and writing skills in both Spanish and English. He finally felt hopeful for his future and happy, and "like a normal kid again."

37.    In May 2024, the Orleans Parish Juvenile Court determined that Elias could not be reunified with his mother due to abuse, abandonment, or neglect and that it was in his best interest to remain in the United States.

38.    Based on this judgment, Elias applied for SIJS with USCIS on May 10, 2024. On July 18, 2024, USCIS approved Elias's SIJS petition and concurrently granted him deferred action. Elias then received an employment authorization document.

39.    On April 21, 2025, without any material changes in Elias's circumstances, without providing any advance notice or an opportunity to respond, and without any explanation, USCIS abruptly terminated Elias's grant of deferred action and subsequently revoked his employment authorization document. Elias reapplied for deferred action on May 8, 2025, and that application was still pending when he was abruptly removed from the United States. The application was subsequently denied on October 24, 2025. Notwithstanding the termination of Elias's deferred action, USCIS assured him that he maintained his SIJS.

*Defendants Unlawfully Arrested and Removed Elias on May 21, 2025*

40.    Before Elias came to the United States, his father, Marcos, was placed in Section 240 Proceedings and received an in absentia order of removal from the Buffalo Immigration Court in 2021. The Section 240 Proceedings against Marcos never included Elias.

41.    In May 2024, Marcos was apprehended by ICE agents conducting immigration enforcement operations, briefly detained, and then released from custody. Defendants placed Marcos on an order of supervision, which required periodic appointments with a DHS subcontractor through the Intensive Supervision Appearance Program ("ISAP"). The order of supervision never included Elias.

42.    Marcos had a scheduled ISAP check-in on the morning of Tuesday, May 20, 2025. He was instructed to bring his children to this appointment and was told that they could not miss it for any reason. Pursuant to this command, Elias and his older brother accompanied their father to the appointment in St. Rose, Louisiana. But as soon as they arrived at the appointment, they were informed that they were all being detained and would be removed. Elias and his father repeatedly asked to contact their attorneys, but their requests were denied. At one point, Elias's father showed ICE agents their attorney's phone number on his phone and asked the agents to call that number. In response, ICE officers forcibly seized Elias's and his father's phones. Coincidentally, an agent inadvertently contacted Elias's attorney, Gabriela Cruz, while he was trying to reach a family member about the vehicle that Elias and his father had used to drive to the appointment with DHS. Immediately, Ms. Cruz notified ICE via email of Elias's approved SIJS and pending deferred action request and urgently requested a call with Elias. Nearly two hours later, ICE responded to Ms. Cruz, stating in an email that there were no impediments to Elias's arrest or removal and that he would "have an opportunity to make calls." However, they did not make good on that statement. After Ms. Cruz responded, again,

clarifying that Elias had never been placed in removal proceedings—and therefore could not be lawfully removed from the United States—ICE did not respond further.

43.    Meanwhile, Elias pleaded with ICE agents, emphatically stating that he did not want to leave the United States and that he did not understand how he could be taken without a removal order. An officer became angry with Elias and told him, "You have no rights." Rather than giving them the opportunity to consult with counsel, ICE officers transported Elias, his father, and his brother to a hotel room, hours away from New Orleans. Scared and hungry, Elias waited in the hotel room for approximately twelve hours.

44.    At approximately 5 o'clock in the morning on May 21, 2025, less than 24 hours after he was originally detained and before his attorney could do anything to prevent it, ICE agents transported Elias to Alexandria International Airport and put him on a plane to Guatemala. By doing so, ICE illegally removed Elias to Guatemala, despite his and his father's strenuous and repeated objections and despite having actual notice of his SIJS status and lack of any removal order or even immigration proceedings initiated.

*Elias Is Suffering Ongoing Harm to This Day*

45.    Elias now faces ongoing and irreparable harm with each day he remains in Guatemala. He has returned to the place where he experienced significant childhood trauma, and he has lost the supportive community in New Orleans that he heavily relied on prior to his removal to navigate the memories of that trauma. His father Marcos reports that Elias "went from being a happy and playful kid to feeling sad all the time," saying that he feels "anguished."

46.    Elias has also lost his hard-fought access to education, as he has been unable to continue his education in Guatemala because he arrived too late to register to begin the normal school year. Just as he was finally beginning to make progress with his education, it has yet again been interrupted and

he has lost access to the mental health and academic support that educators determined was critical for his success and development.

47.    And Elias has now lost his pathway to apply for LPR status based on his SIJS, which can only be done from within the United States, despite Congress' intent that SIJS youth like him be allowed to remain safely in this country. He went from being a thriving teenager with a bright future in the United States to seeing no hope at all.

## FIRST CAUSE OF ACTION

**Elias's Removal Without the Initiation of Section 240 Proceedings and Without a Final Removal Order Are Not In Accordance With Law and Short of Statutory Right, Violating the INA and the TVPRA - 5 U.S.C. §§ 702, 706**

48.    Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

49.    The INA only authorizes the removal of noncitizens who have a final order of removal. 8 U.S.C. § 1231. The INA also provides that such a removal order can typically only be obtained following Section 240 Proceedings, 8 U.S.C. § 1229a, in which noncitizens have the statutory right to contest their removability, seek relief from removal, access counsel of their choice, and seek review of adverse decisions, 8 U.S.C. §§ 1229a(b)(4), (c)(5), 1252(b). The TVPRA further mandates that children designated as UACs from noncontiguous countries must be placed in Section 240 Proceedings. 8 U.S.C. § 1232(a)(5)(D)(i).

50.    Defendants removed Elias to Guatemala without initiating Section 240 Proceedings and without obtaining an order of removal or validly invoking any statutory exception to this requirement, thus violating both the INA and the TVPRA.

51.    Under the APA, a person who is "suffering [a] legal wrong because of agency action . . . is entitled to judicial review thereof." 5 U.S.C. § 702; *see also* 5 U.S.C. § 704 (a "final agency action for which there is no other adequate remedy in a court [is] subject to judicial review"). The reviewing

court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be "not in accordance with law," or "short of statutory right." 5 U.S.C. § 706(2)(A), (C).

52.     Here, Defendants' removal of Elias violated both the INA and the TVPRA and, thus, was not in accordance with law and short of statutory right.

53.     Plaintiff asks the Court to declare Defendants' removal of Elias unlawful and set it aside, immediately ordering Defendants to take all steps reasonably available to them, proportionate to the gravity of the ongoing harm, to facilitate Elias's return to the United States and restore him to the status quo ante.

## SECOND CAUSE OF ACTION

**Elias's Removal Without Access to Counsel Violated the TVPRA - 5 U.S.C. §§ 702, 706**

54.     Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

55.     The TVPRA requires that HHS ensures, "to the greatest extent practicable," that UACs who are in custody or were previously in custody "have counsel to represent them in legal proceedings or matters and protect them from mistreatment, exploitation, and trafficking." 8 U.S.C. § 1232(c)(5); *see also* 8 U.S.C. § 1232(a)(5)(D)(iii).

56.     As set forth above, Defendants violated Elias's statutory right under the TVPRA when they:

      a.  Detained him and held him incommunicado without access to counsel;

      b.  Repeatedly denied his and his father's requests to contact counsel;

      c.  Failed to affirmatively notify counsel of his detention or removal;

      d.  Failed to facilitate any communication between him and his counsel; and

      e.  Ultimately removed him from the United States without access to counsel.

57.    Defendants' unlawful actions contravened the core purpose of the TVPRA, and, as a result, caused Elias's forcible return to Guatemala, the same place where he previously suffered significant abuse and neglect.

58.    Plaintiff asks the Court hold Defendants' actions unlawful and set them aside under 5 U.S.C. § 706(2)(A), (C), immediately ordering Defendants to take all steps reasonably available to them, proportionate to the gravity of the ongoing harm, to facilitate Elias's return to the United States and restore him to the status quo ante.

### THIRD CAUSE OF ACTION

### Elias's Removal Violated His Procedural Due Process Rights - U.S. Constitution, Amendment Five

59.    Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

60.    Elias has a procedural due process right under the Fifth Amendment to the U.S. Constitution not to be removed to Guatemala without notice and an opportunity to be heard and without access to counsel. Specifically, Elias is entitled to a hearing before an immigration judge that complies with the protections mandated by federal statute and regulations.

61.    As set forth above, Defendants removed Elias to Guatemala without even seeking, much less obtaining, a removal order, and therefore without providing him any notice or an opportunity to be heard. Defendants also denied Elias the ability to communicate with his attorney, despite repeated requests, depriving him of access to counsel. As a result, Defendants not only stripped Elias of the right to contest his removal, but also stripped him of the benefits of his SIJS, as he can no longer adjust his status to become an LPR from outside the United States. These actions violated his procedural due process rights under the Fifth Amendment to the U.S. Constitution.

62.    Plaintiff asks the Court to immediately order Defendants to take all steps reasonably available to them, proportionate to the gravity of the ongoing harm, to facilitate Elias's return to the United States. And, if Defendants seek Elias's removal in the future, they should be required to provide him with meaningful notice and an opportunity to be heard in Section 240 Proceedings, with access to counsel; allow him to contest his removal, seek any and all available relief, and exhaust all rights to appeal; and exercise all his statutory and regulatory rights.

### FOURTH CAUSE OF ACTION

### Elias's Removal Violated His Substantive Due Process Rights - U.S. Constitution, Amendment Five

63.    Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

64.    Elias has a substantive due process right under the Fifth Amendment to the U.S. Constitution not to be subjected to government conduct that shocks the conscience. Defendants' conduct, as set forth above, violates that right.

65.    Defendants' conscience-shocking conduct, as detailed above, is inflicting ongoing and irreparable harm upon Elias with each passing day that he remains outside the United States and in Guatemala.

66.    Plaintiff asks the Court to immediately order Defendants to take all steps reasonably available to them, proportionate to the gravity of the ongoing harm, to facilitate Elias's return to the United States.

### FIFTH CAUSE OF ACTION

### Defendants Violated Their Own Binding Regulations and Procedures - The *Accardi* Doctrine, 5 U.S.C. §§ 702, 706

67.    Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

68.    Under *United States ex rel. Accardi v. Shaughnessy*, government agencies are bound to follow their own rules and regulations. 347 U.S. 260, 267 (1954); *see also Battle v. FAA*, 393 F.3d 1330, 1336 (D.C. Cir. 2005) ("*Accardi* has come to stand for the proposition that agencies may not violate their own rules and regulations to the prejudice of others.").

69.    Defendants' actions as set forth herein violated binding agency regulations and procedures designed to protect vulnerable young people like Elias.

70.    First, Defendants violated DHS's own internal directive, Directive 11064.3, which governs how ICE interacts with the children of noncitizens.

71.    In direct violation of Directive 11064.3, Defendants:

   a.    Refused to allow Plaintiff Elias and his father Marcos to communicate with counsel;

   b.    Refused to allow Plaintiff Elias and his father Marcos to communicate with any other family members, including their extended family or other potential caregivers for Elias;

   c.    Took custody of Elias—a minor who was not the subject of a removal order—and held him effectively incommunicado;

   d.    Removed Plaintiff Elias and his father Marcos without allowing Marcos any choice regarding the care of his child.

72.    ICE's violations of its own Directive 11064.3, by and through the acts and omissions of the Defendants, are unlawful agency actions and/or are arbitrary, capricious, and contrary to law in violation of the APA.

73.    Second, Defendants' removal of Elias revoked the benefits of his SIJS status without following the procedures required by 8 C.F.R. § 205.2 and the USCIS Policy Manual.

74.    Defendants' unlawful actions, as set forth herein, are causing Elias irreparable harm with each day that he spends outside the United States and in Guatemala.

75.    Plaintiff asks the Court to hold Defendants' actions unlawful and set them aside under 5 U.S.C. § 706(2)(A), immediately ordering Defendants to take all steps reasonably available to them, proportionate to the gravity of the ongoing harm, to facilitate Elias's return to the United States, and restore him to the status quo ante.

### REQUEST FOR RELIEF

Plaintiff prays for judgment against Defendants and respectfully requests that the Court enters an order:

a)  Declaring that Defendants' actions, as set forth herein, violated the laws of the United States, their own regulations, and the Fifth Amendment to the U.S. Constitution;

b)  Immediately ordering Defendants to facilitate the return of Elias to the United States and restore him to the status quo ante;

c)  Ordering that, should Defendants seek Elias's removal in the future, Defendants provide him with meaningful notice and an opportunity to be heard in Section 240 Proceedings, with access to counsel; allow him to contest his removal, seek any and all available relief, and exhaust all rights to appeal; and exercise all his statutory and regulatory rights;

d)  Granting Plaintiff's costs and fees under the Equal Access to Justice Act; and

e)  Granting such other relief at law and in equity as justice may require.

Dated:  November 10, 2025              Respectfully submitted,

                                        */s/ Kerensa Gimre*
                                        Kerensa Gimre (D.C. Bar No. 1780406)
                                        Margaret McCallister (*admission pending*)
                                        PERKINS COIE LLP
                                        700 Thirteenth Street, N.W., Suite 800
                                        Washington, DC 20005-3960
                                        Telephone: 202.654.6200
                                        Facsimile: 202.654.6211
                                        KGimre@perkinscoie.com
                                        MMcCallister@perkinscoie.com

Emily Drinkwater (*Pro Hac Vice pending*)
PERKINS COIE LLP
1155 Avenue of the Americas, 22nd Floor
New York, NY 10036-2711
Telephone: 212.262.6900
Facsimile: 212.977.1649
EDrinkwater@perkinscoie.com

R. Tyler Kendrick (*Pro Hac Vice pending*)
PERKINS COIE LLP
1301 Second Avenue, Suite 4200
Seattle, WA 98101-3804
Telephone: 206.359.8000
Facsimile: 206.359.9000
RKendrick@perkinscoie.com

Alletta Brenner (*Pro Hac Vice pending*)
PERKINS COIE LLP
1120 N.W. Couch Street, 10th Floor
Portland, OR 97209-4128
Telephone: 503.727.2000
Facsimile: 503.727.2222
ABrenner@perkinscoie.com

Stephanie Norton (*Pro Hac Vice pending*)*
Bridget Pranzatelli (D.C. Bar No. 90029726)
NATIONAL IMMIGRATION PROJECT
1763 Columbia Road NW, Ste. 175 #896645
Washington, DC 20009
Tel: (504) 940-4777
ellie@nipnlg.org
bridget@nipnlg.org
*Working remotely from Wyoming and admitted in
New York only*

Mary Yanik (*Pro Hac Vice forthcoming*)
Laila Hlass (*Pro Hac Vice pending*)
TULANE IMMIGRANT RIGHTS CLINIC
6329 Freret Street, Suite 130
New Orleans, LA 70118
Tel: (504) 865-5153
myanik@tulane.edu
lhlass@tulane.edu

Malcolm Lloyd (*Pro Hac Vice pending*)
Nora Ahmed (*Pro Hac Vice pending*)
ACLU FOUNDATION OF LOUISIANA
1340 Poydras St., Suite 2160
New Orleans, LA 70112
Tel: (504) 522-0628
mlloyd@tulane.edu
nahmed@tulane.edu

*Attorneys for Plaintiff Elias*